UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 1 5 2011 ★

BROOKLYN OFFICE

SHERRI HAYNES, on behalf of herself and
all others similarly situated,

        Plaintiff,

    – against –

PLANET AUTOMALL, INC., PLANET
AUTOMOTIVE, INC. d/b/a/ KG SUZUKI,
NORTHERN AUTOGROUP LLC, and
KANHIYA KINNEY GALANI,

        Defendants.

09-CV-03880 (JBW) (RER)

**MEMORANDUM &
ORDER**



**JACK B. WEINSTEIN, Senior United States District Judge:**

**Appearances:**

For Plaintiff:    LAW OFFICES OF MARTIN MUSHKIN
                   1100 Summer Street
                   Stamford, CT 06905
                   By:   MARTIN MUSHKIN

                   LEMBERG & ASSOCIATES L.L.C.
                   1100 Summer Street
                   Stamford, CT 06905
                   By:   SERGEI LEMBERG
                           SUSAN SCHNEIDERMAN

For Defendants:   LAW FIRM OF RICHARD SIMON
                   39 Lakebridge Drive
                   Kings Park, NY 11754
                   By:   RICHARD SIMON



**Table of Contents**

I.    Introduction ................................................................................................................. 3

II.   Facts and Procedural Background ....................................................................... 5

  A.  Pleadings ................................................................................................................. 5

  B.  Procedural History ................................................................................................. 8

III.  Law ............................................................................................................................. 10

  A.  Class Certification ............................................................................................... 10

    1.  Numerosity ...................................................................................................... 11

    2.  Commonality ................................................................................................... 12

    3.  Typicality ......................................................................................................... 13

    4.  Adequacy .......................................................................................................... 13

  B.  TILA .......................................................................................................................... 14

    1.  Finance Charge ............................................................................................... 15

    2.  APR .................................................................................................................... 22

  C.  GBL § 349 ............................................................................................................... 22

IV.   Application of Law to Facts ................................................................................. 23

  A.  Class Certification ............................................................................................... 23

    1.  Numerosity ...................................................................................................... 23

    2.  Commonality ................................................................................................... 23

3.  Typicality ................................................................................................................ 26

4.  Adequacy................................................................................................................ 27

B.  Difficulties in Managing Class ..................................................................................... 27

V.  Conclusion ......................................................................................................................... 28

## I.  Introduction

Plaintiff Sherri Haynes brings this putative class action against defendants Planet Automall, Inc. ("Planet Automall"), Northern Autogroup, LLC ("Northern Automall"), Kanhiya Kinney Galani and Planet Automotive Inc. (d.b.a. "KG Suzuki") for failing to properly disclose information in violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. The alleged violations occurred when plaintiff purchased a used car from KG Suzuki using credit provided through the dealer. She claims that defendants failed to disclose that various fees charged to customers who received dealer-assisted financing were part of the finance charge, a violation of TILA and section 349 of New York's General Business Law ("GBL § 349").

Sought is certification of a class of individuals who were similarly misled. Plaintiff's motion for class certification relies on statistical analysis of the difference in fees paid by cash and credit customers. Defendants oppose certification on the grounds that plaintiffs' claims are based on different individual oral representations, rendering commonality unlikely and making a class action inappropriate.

In considering plaintiff's motion for class certification, a court recognizes that the class action serves an important function in protecting consumers from abusive business practices. This is particularly true for the type of consumer who would purchase a used car on credit. As a

3

group, they may be more susceptible to the kind of abuses against which TILA and GBL § 349 are designed to protect. They are also less likely to have the means to pursue claims on an individual basis, and therefore less able to seek redress if they are denied the opportunity to sue as a class.

The procedural mechanism of the class action and the statutory provisions plaintiff invokes are premised on a public policy favoring the protection of the kind of consumers found in the proposed class. Statistical evidence of the kind upon which plaintiff relies is often vital for proving elements of plaintiff's claim on a class-wide basis. Thus, the consideration given to plaintiff's motion for certification must be respectful and generous. Yet, as the Court of Appeals for the Second Circuit instructed in a recent case where less affluent buyers of used cars on credit claimed the seller was "burying hidden finance charges in the prices that plaintiffs were charged," their "bad bargain" could not support class certification; "TILA is a disclosure statute, not a fair pricing law." *Poulin v. Balise Auto Sales, Inc.*, --- F.3d ----, 2011 WL 2937210, at *1 (2d Cir. July 22, 2011).

Each used car is unique. Purchases normally involve individual oral negotiations as to price, terms and incidentals, such as warranties, between purchasers of varying experience and skills and an experienced salesperson. Thus, it cannot be assumed that representations to all purchasers will be sufficiently uniform to support necessary class commonality.

On the instant facts, certification is denied. It is inappropriate because of ambiguities in plaintiff's statistical evidence, a lack of other supporting evidence to bolster her claims, the likelihood that the circumstances in oral bargaining for each purchase varied, and the named plaintiff's possible special animus toward defendants that makes her an inappropriate representative.

4

## II.    Facts and Procedural Background

### A. Pleadings

In September of 2008, plaintiff purchased a used 2006 Toyota Corolla from defendant KG Suzuki. Voytovych Ex. 1. At the time of the purchase, she was a twenty-three year old grocery clerk without a college degree. Haynes Aff. ¶ 6. During the oral negotiations that led to her purchase, Haynes did not meet or speak with Galani, the principle owner of KG Suzuki. Nor did she purchase the vehicle or receive financing from defendants Planet Automall or Northern Automall, although both entities are alleged to be affiliated with KG Suzuki and owned by Galani.

The details of plaintiff's purchase are listed on several documents that she was provided (and which she signed) at the time of the purchase. She was given a bill of sale issued by KG Suzuki and a retail installment contract between herself and KG Suzuki on a form issued by M&T Bank, the supplier of credit. Voytovych Exs. 1, 2.

The bill of sale for plaintiff's purchase lists the price of the car as $12,500. Voytovych Ex. 1. The total cost was higher. She was charged $1,301.80 for a processing fee ("Pro Fee"), which the bill of sale lists as for "Customer Requested Dealer Installed Equipment and Accessories." There is no document explaining what, if anything, she received in exchange for the Pro Fee, how the fee was calculated or why a purchaser would want to pay it. Defendants contend that the purpose of the Pro Fee was to recoup a portion of internal costs attributed to each vehicle during individual negotiations. Galani Aff. ¶ 9; Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("Defs.' Opp."), at 9. There is no evidence that the Pro Fee was in any way related to the cost of sale or preparation of the vehicle. Pl.'s Mem. at 11; Mushkin Aff. ¶ 13. (quoting 9/16/10 Tr. at 8-10).

Plaintiff also purchased an extended warranty for $3,000. Voytovych Exs. 1, 2. Like the Pro Fee, the extended warranty was listed as a "Customer Requested Dealer Installed Equipment and Accessor[y]." To cover the warranty, KG Suzuki paid $775 to Guardian Warranty Corporation and retained $2,225.

With the cost of the Pro Fee and the extended warranty factored in, the "total price of vehicle" was $16,801.89. After taxes (an additional $1008.11), plaintiff's cost was $18,255.

The purchase was financed on credit that she obtained through KG Suzuki. She paid $3,000 in cash and borrowed the remaining $15,255. The retail installment contract, which defendants provided to plaintiff, included the entire $15,255 in a category called "amount financed." Taking this amount, and assuming that plaintiff would pay it plus a "finance charge" of $5006.52 over the course of seventy-two monthly payments, the retail installment contract stated that the "annual percentage rate" ("APR") of the loan would be 9.64%. Voytovych Exs. 1, 2.

Plaintiff asserts that the Pro Fee and the cost of the extended warranty should have been included in the finance charge on plaintiff's retail installment contract, not in the amount financed. The APR would then have been significantly higher, as indicated below:

- The finance charge would have been $9,308.41 (the $5,006.52 listed as the finance charge plus the $1,301.80 Pro Fee and the $3,000 cost of the extended warranty).

- The amount financed would have been $10,953 (the $15,255 listed as the amount financed minus the $1,301.80 Pro Fee and the $3,000 cost of the extended warranty).

6

- The APR would have been 22.95% , rather than the 9.64% calculated by defendants.

Mushkin Aff. Ex. 4.

Plaintiff's retail installment contract was not unique in listing the Pro Fee and cost of the extended warranty as part of the amount financed. For KG Suzuki's sales on credit between July 1, 2007 and June 8, 2009 where a Pro Fee was listed or an extended warranty was sold, those charges were listed as part of the amount financed on the retail installment contract. Voytovych Aff. ¶ 1. Some credit customers were charged a "Dlr Fee" in place of a Pro Fee. Like the Pro Fee, the Dlr Fee was shown as part of the amount financed on the retail installment contract. *Id.* According to plaintiff the Dlr Fee is no different than the Pro Fee, and that defendants merely changed the name in 2009. *Id.* ¶ 1 & n.1; Pl.'s Reply at 3. Defendants contend that the Dlr Fee differs from the Pro Fee, and that it "might include service agreements, vin etch vehicle-replacement/theft policies, etc." Defs.' Opp. at 7.

Based on a review by plaintiff's counsel of deal jackets for all sales made by KG Suzuki between July 1, 2007 and June 8, 2009, KG Suzuki charged a Pro Fee or Dlr Fee on 572 of 895 installment sales (63.9%) and three of approximately seventy-four cash sales (4.1%). (Voytovych Aff. ¶ 3; Simon Decl. ¶ 19(a).) If only Pro Fees are considered (as defendants argue would be appropriate), the number drops to 370 of 847 installment sales (43.7%) for a similar period, and remains three of seventy-four cash sales (4.1%).

Defendants argue that these statistics are misleading because the Pro Fee was frequently incorporated into the purchase price of the car. According to Galani, many cash buyers "would request the pro fee not be separately stated in the Purchase Order, but instead be included in the stated sale price, because they would then be able to obtain their own full financing from their

7

own banks [or] credit unions based on the stated sales price." Galani Aff. ¶ 9. In addition, Galani claims that "special arrangements for Purchase Orders showing just the final sales price (without the pro fee listed) were made for many of the dealership's own employees," who were classified as cash buyers despite the fact that they paid on credit in installments from their future earnings. *Id.*

During the same period KG Suzuki sold extended warranties on 373 of 895 installment sales (41.7%) and one of approximately seventy-four cash sales (1.4%). According to defendants, far fewer cash buyers purchased extended warranties because they would have to pay up-front rather than over a long period on credit. *Id.* ¶ 8.

During the ride home from the dealership, plaintiff's car began to shake violently because of a mechanical problem. D.E. 38, Ex. 1. She took the vehicle back for repairs but it continued to malfunction. Defendants refused to provide further service. Plaintiff left the dealership in tears. *Id.* Invoking the Connecticut "Lemon Law," plaintiff's counsel arranged for Toyota, the manufacturer, to repurchase plaintiff's vehicle, discharge her outstanding M&T loan (including her accrued finance charges), and pay $2000 in plaintiff's attorney's fees. D.E. 33, at 3; 5/31/11 Tr. at 31. Defendants have offered to cancel the warranty charge, retroactive to the date Toyota repurchased her vehicle, but plaintiff has declined the offer. *Id.* at 32.

### B. Procedural History

On June 8, 2009, plaintiff filed her class action complaint in the Southern District of New York. With the consent of the parties, the case was transferred to the Eastern District of New York.

The court directed discovery on class certification issues limited to the two-year period ending June 8, 2009. The magistrate judge then ordered defendants to make the "deal jackets" for all retail sales between July 2007 and June 2009 available to plaintiff for on-site inspection.

Following the close of discovery, plaintiff filed a motion for class certification under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. She proposed dividing the class into four sub-classes based on applicable statutes of limitations and conduct alleged. The first and second proposed classes correspond to the one-year statute of limitations period for plaintiff's TILA claims. 15 U.S.C. § 1640(e). Since these classes are based on violations of TILA, membership would be limited to customers who used credit to purchase a vehicle with a base purchase price of $25,000 or less. *See* 15 U.S.C. § 1603(3) (exempting from coverage under TILA credit transactions in which the total amount financed exceeds $25,000, unless the transaction is one in which "a security interest is or will be acquired in real property, or in personal property used or expected to be used as the principal dwelling of the consumer"). The first class would consist of:

> All customers of the Defendants who, during the period June 9, 2008 through June 8, 2009, were charged a pro fee or a dlr fee in connection with the financing [of] the purchase of a vehicle from defendants where the Retail Installment Contract (Motor Vehicle) did not disclose the pro fee or dlr fee as a Finance Charge.

Mushkin Aff. ¶ 23. The second class would consist of:

> All customers of the defendants who, during the period June 9, 2008 through June 8, 2009, purchased an extended warranty in connection with the financing [of] the purchase of a vehicle from defendants where the Retail Installment Contract (Motor Vehicle) did not disclose the actual amount of the purchase price of the warranty retained by defendants or later paid by the warranty issuer to defendants.

*Id.*

9

The third and fourth proposed classes are based on the three-year statute of limitations period for plaintiff's GBL § 349 claims, June 9, 2006 to June 8, 2009. N.Y.C.P.L.R. § 214(2). Membership in these classes would not be limited to customers who bought cars with the base purchase price of $25,000 or less because GBL § 349 contains no such limitation. The third class would consist of:

> All customers of the Defendants who, during the period June 9, 2006 through June 8, 2009, were charged a pro fee or a dlr fee in connection with the financing [of] the purchase of a vehicle form defendants where the Retail Installment Contract (Motor Vehicle) did not disclose the pro fee or dlr fee as a Finance Charge.

Mushkin Aff. ¶ 23. The fourth class would consist of:

> All customers of defendants who, during the period June 9, 2006 through June 8, 2009, purchases an extended warranty in connection with the financing [of] the purchase of a vehicle from defendants where the Retail Installment Contract (Motor Vehicle) did not disclose the actual amount of the purchase price of the warranty retained by defendants or later paid by the warranty issuer to defendants.

*Id.*

## III.  Law

### A. Class Certification

The underlying purpose of the class action mechanism is to foster "judicial economy and efficiency by adjudicating, to the extent possible, issues that affect many similarly situated persons." *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 802 (E. & S.D.N.Y. 1991) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)); *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 349 (1983) ("The principal purposes of the class action procedure [are] promotion of efficiency and economy of litigation . . . ."); *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 553 (1974). In pursuing these goals, a district court is afforded broad discretion in determining whether an action should be certified under Rule 23. *See Teamsters*

10

*Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008); *see also* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1759 (3d ed. 2005); 7AA *id.* § 1785. A court will engage in a "rigorous analysis" of the facts and circumstances of the case to ensure that class certification is appropriate. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982).

Plaintiffs must demonstrate that they satisfy four elements: (1) numerosity, (2) commonality, (3) typicality and (4) adequacy. *Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007) (citing Fed. R. Civ. P. 23(a)). If plaintiffs are able to satisfy all four elements of Rule 23(a), they must then demonstrate that the proposed class meets the requirements of one of the subsections of Rule 23(b). *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2d Cir. 2008) (citing Fed. R. Civ. P. 23).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met.").

### 1. Numerosity

Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is assumed to be satisfied if the putative class reaches forty memebers. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 482, 483 (2d Cir. 1995).

11

## 2. Commonality

Commonality requires a plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement can be satisfied by the existence of a single common question of fact or law. *See Dukes*, 131 S. Ct. at 2556 ("[F]or purposes of Rule 23(a)(2) even a single common question will do." (internal quotations and alterations omitted); *In re Agent Orange Product Liability Litigation MDL No. 381*, 818 F.2d 145, 166-67 (2d Cir. 1987) (military contractor defense common to all defendants sufficient to satisfy commonality requirement); *Port Authority Police Benevolent Ass'n v. Port Authority of New York & New Jersey*, 698 F.2d 150, 154 (2d Cir. 1983) (reversing denial of class certification on Rule 23(a)(2) grounds because of the existence of "a common question of law or fact"). Whether additional questions are common to the class can be determined at the Rule 23(b)(3) stage, when the court is required to determine that common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Erica P. John Fund, Inc. v. Halliburton*, 131 S. Ct. 2179, 2184 (2011) (question of reliance in a securities fraud class action decided as part of predominance analysis of Rule 23(b)(3)).

Rigorous analysis is necessary to determine if a question is common to the class. *Dukes*, 131 S. Ct. at 2556-57 & n.10 (engaging in the rigorous analysis necessary to determine whether the question of discriminatory intent was common to the class at the commonality stage because it was the only potential question common to the putative class); *id.* at 2562 n.3 (Ginsburg, J. dissenting) ("questions" in Rule 23(a)(2) means "disputed issues"). Whether a court is required to determine that a particular question is common to the class for either commonality or predominance purposes, the analysis is the same. *In re Visa Check/MasterMoney Antitrust*

12

*Litig.*, 280 F3d 124, 136 n.6 (2d Cir. 2001) (addressing commonality and typicality in the context of the predominance requirement of Rule 23(b)(3)).

Required is a determination that plaintiffs' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Dukes*, 131 S. Ct. at 2551. A claim is capable of class-wide resolution when the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *cf. Erica P. John Fund*, 131 S. Ct. at 2186 (court need not determine whether loss causation has been proven at the class certification stage because it is capable of class-wide resolution).

### 3. Typicality

Typicality requires a plaintiff to establish that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *see also Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010). This requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes essentially the same legal and factual arguments to prove the defendant's liability. *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). "While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenretter Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000).

### 4. Adequacy

The adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A]dequacy of representation is measured by two standards: first, class counsel must be qualified, experienced

13

and generally able to conduct the litigation; and second, the class members must not have interests that are antagonistic to one another." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992) (internal quotations omitted). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

### B. TILA

TILA is a disclosure rather than regulatory statute. *Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999). Its primary purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). The statute "is not a general prohibition of fraud in consumer transactions or even in consumer credit transactions. Its limited office is to protect consumers from being misled about the cost of credit." *Gibson*, 112 F.3d 283, 285.

"In enacting TILA, Congress delegated authority to the Federal Reserve Board of Governors to promulgate implementing regulations and interpretations known as Regulation Z." *McAnaney v. Astoria Fin. Corp.* (*McAnaney II*), 665 F. Supp. 2d 132, 146 (E.D.N.Y. 2009) (citing 15 U.S.C. § 1604(a)). Regulation Z requires creditors to disclose, among other things, the "finance charge" and the "annual percentage rate" ("APR"). 12 C.F.R. § 226.18(d), (e). TILA imposes civil liability on "any creditor who fails to comply with any requirement imposed under [the portion of TILA dealing with credit transactions]." 15 U.S.C. § 1640(a).

14

## 1. Finance Charge

"[T]he amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). "In order to be considered a finance charge, a charge must be incident to, or a condition of, the extension of credit." *Pechinski v. Astoria Federal Savings and Loan Ass'n*, 345 F.3d 78, 80 (2d Cir. 2003) (citing 15 U.S.C. § 1605(a)). "The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a); *see also Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 934 (7th Cir. 1998) ("[Defendants] need not disclose the [costs of financing] as a finance charge if it attempts to recoup that cost by charging *all* customers higher prices."); *Virachack v. University Ford*, 410 F.3d 579, 584 (9th Cir. 2005) (Fletcher J., dissenting) ("The staff interpretation [of Regulation Z] states '[c]harges imposed uniformly in cash and credit transactions are not finance charges.'" (quoting 12 C.F.R. Pt. 226, Supp. 1 § 226.4-4(a)(1))).

TILA provides the following non-exclusive list of charges that are included in the finance charge:

1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

2) Service or carrying charge.

3) Loan fee, finder's fee, or similar charge.

4) Fee for an investigation or credit report.

5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.

15

6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or the
　　　lender (for delivery to the broker) whether such fees are paid in cash or financed.

*Id.*

　　　Whether charges are incidental to the extension of credit, and therefore included within

the definition of the finance charge, is "extremely fact-intensive." *McAnaney v. Astoria Fin.*

*Corp. v. McAnaney (McAnaney I)*, 357 F.Supp.2d 578, 584 (E.D.N.Y. 2005). "The official staff

interpretation of Regulation Z explains that when determining whether a charge is a finance

charge one should look at the particular credit transaction at issue." *Virachack*, 410 F.3d at 584

(Fletcher, J., dissenting).

　　　When the purpose of the fee or payment is in dispute, the plaintiff bears the burden of

proving that it is part of the finance charge. The key difficulty a plaintiff faces in making such a

showing is proving causation – that the extension of credit *caused* plaintiff to pay a particular fee

or charge. This problem is critical when plaintiff attempts to prove causation on a class-wide

basis.

　　　Several courts of appeals have addressed the issue of what a plaintiff must prove to

establish causation for a class. In *Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283 (7th

Cir. 1997) (cited with approval in *Poulin*, 2011 WL 2937210, at *4), the court considered three

related putative class actions alleging that defendants charged a larger markup for third-party

warranties to credit customers than to cash-paying customers. It held that plaintiffs' claim "has

merit only if the dealer's markup on third-party charges is *systematically* higher on sales to credit

customers than on sales to cash customers." *Id.* at 286 (emphasis in original). "If a dealer

merely charges what the traffic will bear, the fact that a *particular* credit customer may be

paying a higher mark-up than a *particular* cash customer would not transform the difference in

16

mark-ups into a finance charge; it would have in fact no causal relation to the extension of credit." *Id.* (emphasis in original). The court conceded that it could not find a single case holding that a markup must be systematic to violate TILA, but stated that the rule "seems clear as a matter of principle." *Id.*

A similar issue was addressed in *Cornist v. B.J.T. Auto Sales, Inc.*, 272 F.3d 322 (6th Cir 2001) (cited with approval in *Poulin*, 2011 WL 2937210, at *2). In that case, automobile purchasers alleged that defendants charged a higher base price for cars to credit customers than to cash-paying customers. *Id.* at 324. Recognized was the fact that the most important question under TILA is one of causation. "To establish a TILA cause of action for an undisclosed finance charge, the plaintiff must demonstrate a 'causal connection' between the higher price and the extension of credit." *Id.* at 327. The issue presented to the court in *Cornist* was what type of circumstantial evidence would suffice to prove causation for purposes of TILA.

*Cornist* first considered, and rejected, the Seventh Circuit's rule that price increases should only be considered "finance charges" if they are "systematically" charged to credit customers, but not cash customers. It recognized that consideration of systematic disparity could function as an evidentiary tool for determining whether a sum is charged a customer because he paid with credit, but it held that TILA did not require that a plaintiff demonstrate systematic disparity. Instead, it suggested that demonstrating a systematic disparity is one way, but not the exclusive way, of proving causation. *Id.* at 328.

Following the analysis in *Gibson* and *Cornist*, a plaintiff need not prove that a seller *systematically* charged a fee incident to the extension of credit to prove that the charge is part of the finance charge. As the Sixth Circuit stated in *Cornist*, "[a]bsent disclosure, increasing prices

17

because of the extension of credit is not permissible, even if undetectable, because the seller does so only occasionally." 272 F.3d at 328.

Nevertheless, the Seventh Circuit's requirement that fees be "systematically" charged to credit customers, but not cash customers, is relevant. If plaintiffs can prove that defendants systematically charged a fee to credit customers that they did not charge to cash customers, then a factfinder could reasonably infer that the fee was "incident to the extension of credit." *Cf. Erica P. John Fund*, 131 S. Ct. at 2185 (comparing "[t]he traditional (and most direct) way a plaintiff can demonstrate reliance . . . by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation" with the fraud-on-the-market presumption of reliance); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 157 n.3 (2d Cir. 2001) (comparing "individual disparate treatment claims, which primarily follow the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)" with "pattern-or-practice disparate treatment claims that center on group-wide allegations of intentional discrimination").

In order to prove that a defendant has "systematically" charged a particular fee to credit but not to cash customers, a plaintiff must demonstrate that the defendants applied a uniform policy to its customers that distinguished credit from cash customers. *Duren v. Missourri*, 439 U.S. 357, 366 (1979) (a result is "systematic" when it is "inherent in the particular . . . process utilized"); *see, e.g., Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927 (7th Cir. 1998) (plaintiffs stated a claim under TILA by alleging that defendant passed on the cost of obtaining credit by including the cost of obtaining credit in the vehicle price for credit customers, but not cash customers) (cited with approval in *Poulin*, 2011 WL 2937210, at *3).

18

To the extent that a systematic policy can be proven through the use of statistics alone, those calculations, according to the Court of Appeals for the Second Circuit, "have to be of an overwhelmingly convincing nature." *United States v. Rioux*, 97 F.3d 648, 658 (2d Cir. 1996); *see also Duren*, 439 U.S. at 366 (finding "systematic" exclusion from jury pool based on proof "that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year").

An unexplained statistical showing of 100% charged to credit customers and nothing charged to cash customers for an item would obviously suffice to show a systematic overcharge. Something less than this disparity would also be satisfactory in meeting the class's burden.

It may also be possible to prove causation for purposes of TILA, without the need to rely on statistics, by demonstrating that (1) defendants used materially uniform representations to persuade the plaintiff that a particular fee or charge was incident to financing, and (2) the plaintiff must have relied on the representation because the fee provided no obvious value and had no obvious appeal to the customer other than its connection to financing.

In *Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002), the Court of Appeals for the Second Circuit recognized that, in fraud cases, generalized proof may be used to establish the element of a material misstatement when "members of the class received materially uniform misrepresentations." *Id.* at 1255; *see also In re First Alliance Mortgage Co.*, 471 F.3d 977, 991-92 (9th Cir. 2006) (upholding jury finding of a "centrally-orchestrated scheme to mislead borrowers through a standardized protocol the sales agents were carefully trained to perform," despite the fact that the scheme "did not consist of specifically-worded false statements repeated to each and every borrower"). The court rejected the argument that commonality could only be proven with regard to the material misrepresentation element if defendants used uniform written

19

scripts or uniform training materials. *Moore*, 306 F.3d at 1255. "While training and the existence of scripts are relevant factors, the inquiry should remain focused on whether material variations in the misrepresentations existed. No particular form of evidentiary proof is mandated." *Id.* (emphasis added); *cf. Dukes*, 131 S. Ct. at 2556 (pattern or practice can be proven through anecdotal evidence in a reasonable proportion to the class (citing *Teamsters v. United States*, 431 U.S. 324 (1977))).

Despite the willingness of the Court of Appeals for the Second Circuit to allow the use of generalized proof to establish the use of a materially uniform representation, it has been less willing to allow the use of generalized proof to establish the element of reliance. In *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), the court stated that reliance on fraudulent misstatements is generally not capable of being proven on a class-wide basis.

> [P]roof of misrepresentation-even widespread and uniform misrepresentation-only satisfies half of the equation; the other half, reliance on the misrepresentation, *cannot be the subject of general proof.* Individualized proof is needed to overcome the possibility that a member of the purported class purchased [light cigarettes, or "Lights"] for some reason other than the belief that Lights were a healthier alternative-for example, if a Lights smoker was unaware of that representation, preferred the taste of Lights, or chose Lights as an expression of personal style.

*Id.* at 223 (emphasis added). The court went on to find that the fraud-on-the-market presumption of reliance was inapplicable to plaintiffs' claims because the record did not contain sufficient evidence to prove that "the market at large internalized the misrepresentation to such an extent that all plaintiffs can be said to have relied on it." *Id.* at 233-34.

Several factors distinguish the kind of oral representations that might have been made by defendants in this case from the fraudulent misrepresentations alleged in

*McLaughlin.* First, for purposes of her claims, plaintiff does not allege that defendants'
oral statements were fraudulent. Instead, she alleges that defendants' oral
representations, accepted as true, caused defendants' *subsequent* disclosures to be
fraudulent and deceptive. Second, because the Pro Fees and Dlr Fees provide no obvious
value to the customer, and because there is no apparent reason why a customer would
voluntarily choose to pay such a fee absent a representation from defendants that the fee
was necessary to complete some aspect of the purchase or financing, this is not an
instance where well advised purchasers would have been likely to pay the fees for some
reason other than defendants' oral representations. *Cf. In re Pharmaceutical Industry
Average Wholesale Price Litig. (In re AWP Litig.),* 582 F.3d 156 [cite] (1st Cir. 2009)
(distinguishing *McLaughlin* on the grounds that the record evidence, which was
"strikingly consistent" as to each defendant, did not support defendants' argument "that
the class-member consumers may have chosen the product for a variety of reasons");
*Klay v. Humana, Inc.,*382 F.3d 1241 (11th Cir. 2004) (individual reliance could be
proven on a class-wide basis when the alleged misrepresentations were that defendant
HMOs would reimburse plaintiff medical providers for medically necessary services
because "the same considerations could lead a reasonable factfinder to conclude beyond a
preponderance of the evidence that each individual plaintiff relied on the defendants'
representations"); *In re Zyprexa Prods. Liability Litig,* 671 F. Supp. 2d 397, 445-450
(E.D.N.Y. 2009) (citing *In re AWP Litig.* with approval, but denying class certification
because of the "many factual differences which may distinguish the situations of [patients
prescribed Zyprexa and their treating physicians] from one another"). It is possible that,
at least with regard to any charges that provided no benefit to the customer, a plaintiff

could establish causation while submitting no evidence showing that he relied on the defendant's representations, beyond proving that he paid the fee.

Here, it is unnecessary to decide whether an inference of causation could be established by proving that defendants made materially uniform statements regarding the Pro Fees or Dlr Fees. Plaintiff has not relied on the contention that defendants made materially uniform statements regarding the relationship between the issuance of credit and the payment of a particular fee. Nor has she submitted any evidence or allegations that could demonstrate that defendants made such assertions. The only question presented on the record in the instant case is whether plaintiff can prove with statistical evidence alone that defendants systematically charged Pro Fees or Dlr Fees and sold extended warranties to credit, but not cash, customers.

### 2. APR

TILA defines the APR as "the nominal annual percentage rate which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed." 15 U.S.C. § 1606(a)(1)(A). The APR is directly affected by changes to the finance charge and the amount financed. Either increases to the finance charge or decreases to the amount financed will result in an increase in the APR.

### C. GBL § 349

Section 349 of the New York General Business Law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state are hereby declared unlawful." GBL § 349. A section 349 claim has three elements: (1) the defendant's challenged acts or practices must have been directed at consumers; (2) the acts or practices must have been misleading in a material way; and (3) the plaintiff must have sustained injury as a result. *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007).

"Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529 (1995). Plaintiffs must only demonstrate that "the acts or practices have a broader impact on consumers at large." *Id.* Private contract disputes fall outside the purview of GBL § 349. *Id.* Whether acts or practices are deceptive is determined using an objective test. Representations or omissions are considered deceptive when they are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* This determination is based on the individual facts of each case. *Id.*

## IV. Application of Law to Facts

### A. Class Certification

#### 1. Numerosity

The proposed class satisfies the numerosity requirement of Rule 23(a)(1). Between July 1, 2007 and June 8, 2009, KG Suzuki charged a Pro Fee or Dlr Fee on 572 installment sales, and sold an extended warranty on 373 installment sales. The number of putative plaintiffs in this action is well in excess of forty, which is presumed to be sufficient to satisfy the numerosity requirement.

Even if the class is divided into the sub-classes proposed by plaintiff, each sub-class consists of several hundred members. Each of the proposed sub-classes, considered on its own, satisfies the numerosity requirement.

#### 2. Commonality

The only genuinely disputed questions of law or fact are whether the Pro Fees, Dlr Fees and retained portion of the warranties are part of the finance charge pursuant to TILA. *See Dukes*, 131 S. Ct. at 2551; *id* at 2562 n.3 (Ginsburg, J. dissenting) ("questions" in Rule 23(a)(2)

23

means "disputed issues"), *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 676 (N.D. Ohio 1995) ("purely legal question which does not turn on any fact in this case" not a common question for purposes of Rule 23(a)(2)). Whether defendants properly disclosed the Pro Fee and the retained portion of the extended warranty as finance charges are not in dispute – they did not. Both questions hinge entirely on whether the fees were part of the finance charge under TILA.

Plaintiff's proposed questions regarding state law liability: whether the alleged violations of TILA constitute deceptive practices under New York General Business Law § 349; caused defendants to be unjustly enriched under New York law; constitute a constructive trust under New York law; or warrant other damages, are legal questions peripheral to the certification decision. The Supreme Court recognized as much in *Dukes*, when it stated that questions such as "Is [use of discretion] and unlawful employment practice?" and "What remedies should [plaintiffs] get?" were not sufficient to satisfy the commonality requirement of Rule 23. *Dukes*, 131 S. Ct. at 2551 (plaintiff's proposed question regarding the appropriate measure of damages is found to be insufficient to meet the commonality requirement). As to the critical two disputed questions – whether the Pro Fees, Dlr Fees and retained portion of the warranties are part of the finance charge pursuant to TILA – plaintiff has not shown that they can be answered uniformly on a class-wide basis. This is true for both the TILA and the GBL § 349 sub-classes

In evaluating plaintiff's evidence, the requirement of the Court of Appeals for the Second Circuit that proof be overwhelming, as stated in *Rioux*, must be applied. Plaintiff's statistical evidence shows that 63.9% of credit customers and 4.1% of cash customers were charged a Pro Fee or a Dlr Fee during the two year period between July 1, 2007 and June 8, 2009. If only Pro Fees are considered, the percentage of credit customers who were charged the fee drops to 43.7%. Although the percentage of credit customers charged a Pro Fee or Dlr Fee is

24

significantly higher than the corresponding percentage for cash customers, plaintiff has failed to prove that defendants systematically charged credit customers a fee that was not charged to cash customers. First, the fee was not charged exclusively to credit customers. Three known cash paying customers were charged a Pro Fee over the two year period. Plaintiff does not provide any explanation for why cash paying customers would ever be required to pay a fee incident to the extension of credit. Second, even if the fact that cash customers were charged the fee is not fatal to plaintiff's commonality argument, the percentage of credit customers charged a Pro Fee or Dlr Fee is below what would be required to prove that application of the fee to credit customers was "inherent in the particular . . . process utilized" by defendants to assess the fee. *Duren*, 439 U.S. at 366. The evidence demonstrates that the fee is not uniformly charged to all credit customers, and plaintiff has not suggested any systematic method for overcharging utilized by defendants. Although the statistical evidence suggests some correlation between the Pro Fee and credit purchases, it does not sufficiently demonstrate that a systematic illegal policy was being applied to the class.

The "expert" report of David A. Stivers submitted by plaintiff tends to support the position of defendants. It states that a "pro fee" practice is "commonly shared by America's auto dealers, . . . who often view this purely as a profit bump." *See* Report of David A. Stivers, at 1 (May 19, 2011). The pro fee is sought to be added to the cost of the automobile without respect to whether the sale is for cash or credit. *Ibid.*

Plaintiff's statistical evidence regarding the extended warranty fares no better. Between July 1, 2007 and June 8, 2009, 41.7% of credit customers and 1.4% of cash customers purchased an extended warranty. As with the Pro Fee, defendants sold at least one extended warranty to a cash customer, demonstrating that extended warranties were not sold exclusively to credit

customers. And plaintiff's statistical evidence fails to prove the existence of any sort of systematic method for misleading credit purchasers that may have been utilized by defendants. That the extended warranty provided a large profit to the seller did not make it illegal. *Poulin*, 2011 WL 2937210, at *1.

Plaintiff has also failed to establish that any element of her GBL § 349 claim could be proven on a class-wide basis. To the extent plaintiff's GBL § 349 claim is not premised on a violation of TILA, she has failed to establish that defendants' allegedly fraudulent oral representations were materially uniform for the entire class. *See supra* Part III.B.1. Even if plaintiff had established that defendants' employed a materially uniform pitch, she would still need to prove reliance on defendants' fraudulent statements, which "cannot be the subject of generalized proof" in the Second Circuit. *McLaughlin*, 522 F.3d at 223.

### 3. Typicality

Plaintiff may satisfy the typicality requirement of Rule 23(a)(3) because her claims are the same as those of the putative class members. Plaintiff alleges that she was charged a Pro Fee that should have, but was not, included as part of the finance charge when she received dealer-assisted financing to purchase a car from defendants. She also claims that defendants sold her an extended warranty and failed to disclose how much of the price of the warranty they retained, or that the retained portion was part of the finance charge.

Plaintiff's allegations are identical to the claims that allegedly would be brought by the putative class members, and appears to satisfy the typicality requirement. Nonetheless, the oral nature of negotiations for price and services in each individual case and the lack of any independent showing of a uniform approach by salespersons suggest that typicality cannot be established.

26

### 4. Adequacy

Even if plaintiff were able to prove that there is a disputed question of law or fact common to the class, certification of a class would still be improper because plaintiff has failed to demonstrate that she is an adequate representative of the class.

In addition to this action, plaintiff has pursued a separate action concerning details of her purchase that are entirely separate from defendants' failure to properly report the finance charge and APR on her purchase, and which appear to have been traumatic for her. She alleges that on her ride home from the dealership, her car began to shake violently due to a mechanical problem. When she returned to the dealership, they refused to take the car back and she left the dealership in tears. Plaintiff then engaged counsel to pursue a claim under Connecticut's Lemon Law against Toyota with regard to the car's mechanical problems.

Because plaintiff may have an animus towards defendants concerning events that are entirely irrelevant to the instant action (which deals exclusively with the manner in which fees were reported to her), she has not demonstrated that she would be an adequate class representative who could decide procedural and tactical questions on a wholly objective basis, independent of her own special relationship with defendants. *See Matassarin v. Lynch*, 174 F.3d 549 (5th Cir. 1999), cert. denied, 528 U.S. 1116 (2000) (named plaintiff's antagonism to defendants prevented her from representing class); *cf.* Fed. R. Civ. P. 23(b)(3)(B) (court must consider "the extent and nature of any litigation . . . already begun by . . . class members").

### B. Difficulties in Managing Class

In deciding whether to certify a class action, important considerations are the prospective difficulties in managing the controversy in this form. As Rule 23(b)(3)(D) instructs: "the likely difficulties in managing a class action" are relevant to the decision on whether to certify.

Perceived administrative issues are pertinent to concluding that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In the instant case, the individual price and ancillary charges for each unique used car are likely to have been negotiated between different salespersons and buyers. Decision will likely require a separate inquiry about what was said in the course of each bargain. Administration of a case involving separate inquiries about the nuances of hundreds of sales is almost certain to inflate the costs to the parties and the time and effort required by the court in supervising discovery and trial. This is a strong reason for denying class certification.

## V. Conclusion

Plaintiff's motion for class certification is denied. Her individual case is set for trial on September 12, 2011. Selection of the jury will commence before the court at 10:00 a.m. unless the parties stipulate to selection by the magistrate judge at the same time and date.

The parties shall make all *in limine* motions returnable before the court at 10:00 a.m on September 6, 2011. At that time, the parties shall have exchanged (1) all documents, marked as exhibits; lists of witnesses with a brief statement of what each witness is expected to say; complete experts' reports pursuant to Federal Rule of Civil Procedure 26(a)(2); and proposed jury charges with supporting briefs. Copies of all documents shall be furnished to the court. If the parties cannot agree on a briefing schedule they shall promptly seek the assistance of the magistrate judge.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: August 12, 2011
      Brooklyn, New York